McDonald (Chester R.), a partner, under the firm name and style of McDonald Investment Company, Respondent, v. McDonald (Ronald C.), and others, partners under the firm name and style of McDonald Investment Company, and Ronald C. McDonald, Executor of the Estate of Chester S. and Margaret E. McDonald, Defendants and Respondents: Bleser and another, partners under the firm name of McDonald Investment Company, Appellants. [Case No. 432.]

McDonald (Chester R.), Respondent, v. McDonald Lumber Company, Inc., and others, Defendants: Bleser and another, Appellants. [Case No. 433.]

*Nos. 432, 433. Argued March 5, 1975.—Decided May 6, 1975.*
(Also reported in 228 N. W. 2d 727.)

For the appellants there was a brief by *Habush, Gillick, Habush, Davis & Murphy,* attorneys, and *Howard A. Davis* of counsel, all of Milwaukee, and oral argument by *Howard A. Davis.*

For the plaintiff-respondent there was a brief by *Kaftan, Kaftan, Kaftan, Kuehne & Van Egeren, S. C.* of Green Bay.

For the defendants-respondents there was a brief by *Bittner, Petitjean & Hinkfuss* of Green Bay, and oral argument by *Robert L. Bittner.*

DAY, J. The question here is, does the record support the finding of the trial court that the statutory [1] provision for payment to a deceased partner's estate of interest or profits on ownership share during the wind-up period is not applicable in this case? We conclude the record does not support such a finding.

This case has previously been before this court on other issues. *McDonald v. McDonald* (1972), 53 Wis. 2d 371, 192 N. W. 2d 903. These actions were commenced in the fall of 1969 and involved the dissolution, liquidation and termination of the McDonald family businesses organized in corporate and partnership form. The first action was commenced by Chester R. McDonald in October of 1969, to dissolve the family partnership and the second action was a separate action by the same plaintiff commenced in September of 1969, to dissolve the family corporation.

---

[1] "178.37 **Rights of retiring or deceased partner.** When any partner retires or dies, and the business is continued under any of the conditions set forth in s. 178.33 (2) (b) or 178.36 (1), (2), (3), (5) and (6), without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by s. 178.36 (8)."

The record presently before us, however, involves only the initial October, 1969, action and two amended complaints in the action against the partnership. There is no complaint in the record specifically against the corporation in this case. However, in the final amended complaint in Case No. 432 the allegations of the companion action against the corporation are said to be incorporated therein.

Prior to 1950 Chester S. McDonald (father) and Margaret E. McDonald (mother) managed, controlled and operated the various family businesses under the name of the McDonald Lumber Company as sole proprietors and partners. Their four sons—Ronald, James, Chester R. and Robert—worked as employees for them. In 1950 the parents, by oral agreement admitted the four sons into the partnership. Capital accounts of $10,000 were set up for each of the sons. Profits from the business were to be credited to these accounts and withdrawals were to be deducted as the living expenses of the partners required. There was no agreement between the partners that fluctuation in their capital accounts would increase or decrease their proprietary interest in the partnership. By mutual agreement, the interest of each partner was fixed on the basis of one-third interest to the father, one-third interest to the mother, and one-third interest to be split equally between the four sons; each of the sons thereby getting a one-twelfth interest. However, by agreement between the six partners the profits were to be split equally. In 1955 the partners agreed to form a corporation which they called the McDonald Lumber Company, Inc. Thereafter, the partnership was called the McDonald Investment Company. After the corporation was formed, all activities which required employees, materials, equipment or inventory of any sort were transferred to the corporation and only the rental properties, which had already been constructed by the partnership as

the lumber company, was left with the partnership as investment company. The father died in 1960 and the testimony was clear that while he lived he had the dominant position in the enterprises and they were run as he saw fit. The mother was intimately involved in the business and worked with it. The father named her as executor of his will.

Upon his death the mother became the dominant force in the business, as this court recognized in the prior *McDonald Case,* page 381. The mother died in 1965.

It was stipulated and agreed that the wills of both the father and mother distribute the benefits of their holdings equally between the children, which include the four sons previously mentioned and two daughters, Ora Bleser and Shirley Howerton. The daughters were not partners in the investment company but did own some stock in the corporation. Since the estates are still open, this division has not been completed.

The issues which are present in this appeal arise from the fact that when the father died in 1960, the mother, as executor and as a surviving partner, agreed with the four surviving partner sons that as the business continued, the father's estate would receive none of the partnership profits. Partnership profits were split five ways, with the mother and the four sons each taking an equal share. In 1964 Ronald became the executor of his father's estate, replacing his mother, and that division was continued. In 1965 the mother died and Ronald was also named as executor of his mother's estate. The four surviving partner sons then agreed that as the business continued the mother's estate would receive one-fifth of the partnership profits. It was also agreed that the father's estate would continue to receive none of the profits and that the sons would receive one fifth each. The practical result of this arrangement is that the two daughters who share equally in the estates, receive noth-

ing from the father's estate with respect to profits from the partnership. With respect to their share of their mother's estate, they receive a sixth of one fifth of the profits from the partnership operation. This arrangement is more beneficial to the four brothers.

When this case was previously before this court it was found that all the assets denominated by the McDonalds as corporate or partnership assets were in fact the sole property of the partnership; that the partnership should be dissolved, its assets liquidated and distributed, and that the corporation should be dissolved and its assets distributed, either directly to the partners or to the partnership and then to the partners in proportion to their interest in the partnership as found by the trial court. *McDonald* at page 389. This court at that time noted that the trial court had reserved jurisdiction to determine the final obligations of the partners and to make further determinations as necessary to implement and enforce the judgment in the case.

On May 21, 1973, subsequent to the decision in *McDonald,* a trial was held to determine, among other things, whether the surviving partners and the executors of the two estates properly allocated profits to the estate of the father and mother. The trial court upheld the allocation of no profits to the father's estate and one fifth of the profits to the mother's estate, and judgment was entered accordingly on August 27, 1973. The daughters Ora Bleser and Shirley Howerton appeal from that portion of the judgment and claim that they are entitled to share in one third of the profits of the partnership in their father's estate and one third of the partnership profits in their mother's estate under the statute cited above. The son, Chester R. McDonald, having settled the matters in contention with his brothers, filed a brief on this appeal, agreeing with his brothers who are the respondents here.

The brothers claimed below and again contend on this appeal that the issue of how the partnership profits were allocated to the estates of their parents was a question not properly before the circuit court but could only be decided by the probate court. We disagree. Their argument is that under the statute a partner's interest in the partnership is personal property [2] and that a will does not pass title to personalty to the beneficiaries without administration but that title vests in the personal representative. *Peters v. Kell* (1960), 12 Wis. 2d 32, 41, 106 N. W. 2d 407. In support of their contention that the sisters must bring their action in county court, the brothers rely on *La Russo v. Paladino* (1951), 109 N. Y. Supp. 2d 627, affirmed, 280 App. Div. 988, 116 N. Y. Supp. 2d 617. In *La Russo,* the widow of a deceased partner, who was also the administratrix of the estate, brought an action for an accounting as such administratrix and individually and as the guardian *ad litem* of a minor child. The court held that the statute of limitations of ten years had run and that only the deceased partner's legal representative was entitled to call on the surviving partner, her deceased husband's brother, for an accounting, but that in the capacity of an heir of the deceased and as guardian *ad litem* for another heir, she had no standing. The instant case is distinguished in that in the matter before us the personal representative of the deceased is also a partner. *La Russo* does not deal with the question of whether or not the issue raised here must be brought in the probate court. However, that issue has already been settled in the case previously before us, *McDonald v. McDonald, supra,* at page 374, where the judgment ordered the dissolution of the partnership, the liquidation of its assets (which includes profits), the

---

[2] "178.22 **Partner's interest in partnership.** A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property."

distribution of the proceeds, and appointed a receiver to accomplish those purposes. At page 379, this court pointed out that the trial court reserved jurisdiction to determine the final obligations of the partners and that judgment was affirmed by this court. The mandate in *McDonald* at page 389 remanded the matter ". . . for further proceedings to liquidate the partnership . . . ."

In their brief the brothers make the assertion that the sisters ". . . have no status or right to deal with the assets of the estate such as a partner's interest, and consequently cannot demand an accounting." The only authority cited for this proposition is the *La Russo Case*. However, as pointed out, the personal representative in that case was the nonpartner widow of the deceased partner.

It has frequently been held that where the interests of the personal representative are antagonistic to those of the heirs or distributees that the heirs or distributees may maintain actions relating to personalty of the estate in their own names. 31 Am. Jur. 2d, *Executors and Administrators,* p. 318, sec. 791. *See: In re Voorhees' Estate* (1958), 8 Utah 2d 231, 332 Pac. 2d 670; *Ziering v. Berger* (Fla. App. 1968), 209 So. 2d 681; *Ryan v. Kelsey* (3d Cir. 1919), 259 Fed. 945, 7 A. L. R. 234. In the instant case, where it is the position of the sisters that the executor is statutorily required to obtain for the estate either interest on the deceased partner's share of the ownership or profits attributable to the continued use of that share, the sisters, as beneficiaries of the will, have standing to demand an accounting.

We conclude therefore that the circuit court has jurisdiction and that the sisters have standing to raise the issue of the applicability of sec. 178.37, Stats., on appeal.

The crucial question in the case is whether or not under sec. 178.37, Stats., the estates of the deceased father and mother were entitled to either interest on the

value of their interest in the dissolved partnership or profits attributable to the use of their right in the property of the dissolved partnership. Dissolution occurs upon the death of a partner. Termination results when the affairs of the partnership are finally wound up.[3] It is the period of operation between dissolution and termination here that raises the question: What is the estate of the deceased partner entitled to, if anything, during the winding-up period?

In the absence of an agreement to the contrary, the entitlement is that set out in sec. 178.37, Stats. The purpose of this section of the statute has already been stated by our court in the case of *Sechrest v. Sechrest* (1946), 248 Wis. 516, 518, 22 N. W. 2d 594:

"The reason for the provision in the partnership law for payment of either interest on the retiring partner's share of the assets or profits, at his option, is not because the retiring partner still retains an interest in the business but rather is intended to give him a return on assets belonging to him which still are being employed in the business by the remaining partner."

What the court said about a retired partner has equal applicability to the representative of a deceased partner. The reason for this section of the Uniform Partnership Act has also been set forth in the case of *Wikstrom v.*

---

[3] "178.25 **Dissolution of partnership defined.** (1) The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business.

"(2) On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

The official comment to this provision of the act states that:

"In this act dissolution designates the point in time when the partners cease to carry on the business together; termination is the point in time when all the partnership affairs are wound up; winding up, the process of settling partnership affairs after dissolution." 6 Uniform Laws Annotated (1969), *Uniform Partnership Act*, p. 365, sec. 29.

*Davis* (1957), 211 Or. 254, 278, 315 Pac. 2d 597, where that court stated:

"... to receive interest or profit on his share while awaiting receipt of this value upon the completion of the winding up of the partnership business is in the nature of a species of compulsion as to those continuing the business in order to hasten its orderly winding up, thereby avoiding the burden to themselves of paying [the estate] interest or profits for the use of his property."

The election between interest and profits may occur after winding up, so that if there has been a net loss, the executor may elect to receive interest instead of non-existent profits. *Moseley v. Moseley* (9th Cir. 1952), 196 Fed. 2d 663.

The respondent brothers cite that portion of the act, sec. 178.37, Stats., that would nullify this provision for interest or profits if it is otherwise agreed.

The first question is whether or not the father or the mother did "otherwise agree" to no distribution in the case of the father's estate and a one-fifth distribution of profits in the case of the mother's estate. The trial court in its opinion stated:

"The Court feels that it would be inimical to the intentions of Chester and Margaret to now declare reallocations of profits or change the form of their distribution as they had been maintained from 1950 to 1960 and from 1960 to date. The domination and will of the parents in the business pervaded and continued until their deaths in 1960 and 1965. There are strong and reasonable inferences flowing from the evidence in the cases that there was an implicit agreement between the parents with respect to the manner of allocating profits during the lifetimes of the parents and after their deaths."

The method followed was approved and incorporated in the court's judgment. The question is whether or not this finding by the trial court is against the great weight

and clear preponderance of the evidence. There is no evidence offered by the brothers in support of the court's finding. of such implicit agreement. In oral argument the counsel for the brothers referred to the totality of the circumstances surrounding this case and that seems to revolve around the dominance, first of the father and then of the mother, in the affairs of the partnership during their lifetimes. The respondents cite in their brief from *McDonald,* page 383 :

"Normally, the death of a partner dissolves a partnership, but in this case even two deaths did not, although the estates were treated differently. McDonald, Sr.'s, estate received no profits after his death but the estate of Mrs. McDonald did receive a share of the profits. The situation exhibited in these appeals is not infrequent in family corporations where the family members between themselves think in terms of the family and pay little or no attention to legal structure or corporate entity regarding them as necessary red tape."

The important word here is "necessary," because, whether or not this family in its operation regarded the statutes as "red tape," they nevertheless must be followed. The only testimony offered on this issue that would go to the intention of the decedents was the testimony of the son Chester R. McDonald. He testified that prior to his father's death there was no agreement among the partners as to the allocation of partnership income after the death of a partner and no agreement between his father and the sons as to what would happen to that income after the father's death. He further testified that prior to his mother's death, while she participated in the agreement made by herself and the brothers to allocate nothing to the father's estate, there was no agreement between her and the brothers whether or to what extent her estate would share in partnership profits after her death. We find it significant that there was no express agreement on this point. To conclude that this was what

the father "otherwise agreed" merely because his executors did in fact pay nothing to his estate for the continued use of his property in the partnership falls short of what should be required to find such an implied agreement. The fact is that the will of the father said all of the six children, including the daughters, should inherit equally. We would find more implication in his will as to his wishes with respect to his estate upon his death, including his partnership interest, than can be inferred from his silence on the matter. The same is true with respect to the mother's estate. Here again, her will treated all the children equally and there is no evidence that she made any agreement that her estate would receive less than that provided by the statute. We conclude therefore that the finding by the trial court that there was an implicit agreement on the part of the parents with respect to partnership profits allocated to their respective estates is against the great weight and clear preponderance of the evidence. It is clear that the mother during the period of time that she was the personal representative of the father's estate and the son Ronald during the period of time that he was personal representative of the father's estate and the mother's estate did not make the election for interest or profits under the statute.

The brothers next argue that the representative of the deceased partner may enter into an agreement to forego the statutory election between profits or interest. Such an agreement was entered into by the mother with respect to the estate of the father and by Ronald Mc-Donald with respect to the estate of the father when he succeeded his mother as executor and also as executor of his mother's estate. This agreement, however, was not relied upon by the trial court for its conclusion and whether such an agreement suffices is a question of law. In support of this position in their brief the brothers rely

on *Tucker v. Tucker* (1952), 370 Pa. 8, 87 Atl. 2d 650. The case, however, is clearly distinguishable from the one before us. In *Tucker* the agreement between the legal representatives of the deceased partner and the surviving partner was made pursuant to the will of the deceased partner. In *Tucker* the partners entered into an agreement whereby the partnership was to be allowed to continue indefinitely under any terms after the death of one by mutual agreement of the surviving partner and unanimous consent of all the trustees of the deceased partner's estate. The deceased partner's will authorized his trustees to continue the partnership as provided in the agreement. They did in fact continue the business on somewhat altered terms than existed prior to the one partner's death. The Pennsylvania court said the statutory election was not applicable due to the agreement that the deceased partner had participated in. His specific intent was shown in the agreement and in the will. No such agreement is shown in this case.

The respondent brothers call our attention to a quotation from 60 Am. Jur. 2d, *Partnership*, p. 143, sec. 234, stating that:

". . . the surviving partners and the representatives of a deceased partner may agree upon an adjustment of the partnership affairs upon any basis that they choose, and in the absence of mistake or fraud such an adjustment will be binding on all the parties to the agreement."

The only authority cited by American Jurisprudence for this statement is *M. & C. Creditors Corp. v. Pratt* (1938), 172 Misc. 695, 17 N. Y. Supp. 2d 240, 260 (Sup. Ct. affirmed memo), 255 App. Div. 838, 7 N. Y. Supp. 2d 662 (1st Dept.), affirmed per curiam (1939), 281 N. Y. 804, 24 N. E. 2d 482. The *Pratt* court, however, quoted the following from *Matter of Silkman* (1907), 121 App. Div. 202, 207, 208, 105 N. Y. Supp. 872, 875, affirmed (1907), 190 N. Y. 560, 83 N. E. 1131, which in

turn was quoting from *Holladay v. Land & River Imp. Co.* (7th Cir. 1893), 57 Fed. 774, 797:

" '. . . the executor of a deceased partner, if not a member of the firm, may agree with the survivor that the share of the deceased may be ascertained in a particular way, or taken at a certain value . . . .' "

In the *Pratt Case* none of the deceased partner's legal representatives was a surviving member of the partnership. In *Silkman* there was quoted with approval a passage from Lindley, *Partnership* (Ewell's 2d Am. Ed.):

" 'A *bona fide* sale, however, by the executors to the surviving partners, can generally be made with safety, if no surviving partner is an executor.' " *Silkman,* at page 208.

The *Pratt Case* does not consider the issue whether the legal representative of a deceased partner, who is also a surviving partner, may agree with the other surviving partners to allocate to the deceased partner's estate neither interest nor profits, in contravention of the statutorily prescribed option.

The respondent brothers also call our attention to the case of *Blumer Brewing Corp. v. Mayer* (1936), 223 Wis. 540, 269 N. W. 693. In that case the deceased partner's executor, who was also the sole surviving partner, allowed the partnership business to continue and incur debts. This court held he had the power to do so and that the deceased partner's partnership interest was liable along with the surviving partner for the debts incurred after the dissolution of the partnership but prior to its termination. The Uniform Partnership Act permits the continuation of the business in the absence of an agreement not to, but there is a great deal of difference in a continuation of a partnership business as was done in *Blumer* where at least there was a possibility that the estate of the deceased partner might benefit from the continuation of the business and in the case before us

where one estate, the father's, was to receive nothing during the winding-up period and the estate of the mother was to receive less than is provided by statute.

We find no authority, nor was any cited to us by the respondents, which holds the executor of a deceased partner's will can enter into an agreement with surviving partners that in effect deprives the estate of the right to either interest or profits provided for in sec. 178.37, Stats. We hold that on the facts of the case before us no such authority existed and on remand the executor must make a choice under the statute to pay to the father's estate interest on the value of his interest in the dissolved partnership or, in lieu thereof, the profits attributable to the use of his right in the property of the dissolved partnership. The same choice must be made in the mother's estate.

The respondents in their brief refer to an alleged agreement among the surviving partners and the mother wherein the estate of the father would receive none of the profits but would not be subject to any of the losses. The respondents cite nowhere in the record where this agreement appears and we do not find it. Such an agreement, however, is not one of the options given to the personal representative under sec. 178.37, Stats.

The brothers also alleged that what was done by the executor in this case is within the authority granted to the executor by the will of the deceased father.

The respondents in their appendix to the brief cite the authority to carry on business allegedly granted to the executor by the will of the father:

"2. *Authority to Carry on Business.* I authorize my Executor to continue any business which I may own at my death for such period of time, and in the form either of a proprietorship, partnership, or corporation, as shall be in the best interests of my estate, without liability for any losses . . . ."

The will of the father is not made part of the record and is therefore not before us. In the trial of the case there was a stipulation that the will of both parents and the proceedings in the county court could be available to the circuit court for "such use of them as he sees fit." However, the issues were closely circumscribed by the court as "raising only the question of ownership of the assets of the corporation" and the stipulation was for receipt of the county court proceedings on that issue only and would not cover the issue of the distribution of profits or interest to the estates of the decedents. However, the "Authority to Carry on Business" is also given to a personal representative under the Uniform Partnership Act and in this case is closely limited by the words "as shall be in the best interests of my estate . . . ." The record here does not show that it is in the best interest of the father's estate to get neither interest on ownership share nor an allocation of profits attributable to the use of the deceased's right in the property of the dissolved partnership.

The will of the mother is not part of the record nor is any abridgement of its provisions made part of the respondents' appendix.

It is obvious that the purpose of sec. 178.37, Stats., in giving the personal representative an election of interest on the value of the interest of the deceased in the dissolved partnership or profits attributable to the use of the right of the decedent in the property of the dissolved partnership is so that the personal representative is placed in a position of doing that which will most benefit the estate during the period when the partnership is being wound up after dissolution and before termination.

Lastly, the respondent brothers raise the defense of laches. In *Estate of Korleski* (1964), 22 Wis. 2d 617,

622, 126 N. W. 2d 492, this court set forth the elements of laches:

"The three essential elements of the defense of laches are: Unreasonable delay in commencing the action; knowledge of the course of events and acquiescence therein; and prejudice to the party asserting the defense."

The record in this case shows that the second element is lacking. Both the McDonald sisters testified at the trial on May 21, 1973, that they were unaware of how the profits of the partnership were in fact being allocated to the estates until this action was commenced. It is undisputed that the brothers were in complete control of the businesses. One sister occasionally worked in the office of the corporation, helping with secretarial or clerical chores, but neither sister was a partner nor involved in the management of the partnership. Shirley Howerton testified that after her father died she was assured by all concerned that she would receive her one sixth of everything in his estate. After her mother died, she received the same assurances. She was not aware how profits were actually being divided although she knew she was to receive a one sixth of her parents' estates. She relied on those in charge of the family businesses. It was not until 1969 that she and her sister Ora Bleser commenced an action to remove her brother Ronald as executor. That application was denied and the denial was affirmed but the grounds asserted there and rejected are distinct from those presently before us. There is no evidence in the record to contradict Mrs. Howerton's assertion that she was unaware of her brothers' allocation of partnership profits to her parents' estates until at least 1969 when this action was commenced by her brother Chester.

Ora Bleser's testimony was to the same effect. She worked very briefly in the office but never saw any of

the records and she trusted her brothers to fully implement the wills of her parents and as a result did not push any inquiries. Laches can be a successful defense when the unreasonable delay is caused not by knowing acquiescence but by the lack of diligence in discovering and asserting the right. *Bade v. Badger Mut. Ins. Co.* (1966), 31 Wis. 2d 38, 47, 142 N. W. 2d 218. The action of the sisters here under all of the facts and circumstances was not unreasonable. Their failure to discover the actual allocation of the profits until after legal action had been commenced and they had counsel was not lacking in due diligence. It is not the fault of the sisters that a legal action commenced by their brother Chester had several stages and one appeal to pass through before the proper allocation of postdissolution profits could be considered. We therefore find the defense of laches to be without merit.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings not inconsistent with the opinion.